HUGHES A. BAGLEY AND MARILYN B. BAGLEY, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18838–82.    Filed October 30, 1985.

*Sam S. Killinger*, for the petitioners.
*J. Anthony Hoefer*, for the respondent.

FAY, *Judge*: Respondent determined a deficiency of $40,760 in petitioners' 1978 Federal income tax. The issues are (1)

---

[9]*Helfand v. Commissioner, supra.*

whether a payment received by petitioner Hughes A. Bagley from his employer in exchange for the termination of an employee stock option is taxable as capital gain or as ordinary income; and (2) whether a consulting fee received by petitioner Hughes A. Bagley is taxable to him or rather, to his wholly owned corporation.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners Hughes A. Bagley and Marilyn B. Bagley are husband and wife. They timely filed a joint Federal income tax return for 1978 with the Internal Revenue Service Center at Kansas City, Missouri. Petitioners resided in Sioux City, Iowa, when they filed their petition herein.[1]

In August 1975, petitioner Hughes A. Bagley (herein petitioner), commenced working as a consultant for Spencer Foods, Inc., a Delaware corporation having a place of business in Spencer, Iowa (herein Spencer Foods). Spencer Foods was engaged in meat packing and processing, a business in which petitioner had extensive prior experience.

On November 5, 1975, petitioner and Spencer Foods entered into an employment agreement (herein the employment agreement), pursuant to which Spencer Foods agreed to employ petitioner for 5 years as vice president of its Breaking and Fabricating Division. The employment agreement provided that petitioner would receive annually a fixed salary of $50,000 and a discretionary bonus, and would be granted a qualified stock option to purchase 10,000 shares of common stock of Spencer Foods.[2]

The employment agreement contained several provisions concerning the option which petitioner would be granted. It provided that, in the event Spencer Foods were acquired by another entity, petitioner would have the right to receive, in

---

[1]Petitioner Marilyn B. Bagley is a party to this proceeding only by virtue of the joint return filed by petitioners for the taxable year here in issue.

[2]Par. 4 of the employment agreement, in which petitioner and Spencer Foods were referred to respectively as "Employee" and "Employer," provided as follows:

"4. In addition to the salary and bonus provisions above provided for, the Employee shall be granted a qualified stock option to purchase 10,000 shares of Employer's common stock under the provisions and in accordance with the terms of its Qualified Stock Option Plan, at an exercise price equal to the closing price of such stock on the American Stock Exchange on the date of this Agreement."

exchange for his option, an amount equal to the difference between (a) the exercise price of the option granted to him and (b) the closing market price of Spencer Foods' stock on the closing date of such acquisition. It further provided that the option would remain in force throughout the 5-year term of the employment agreement, even if petitioner's employment with Spencer Foods were terminated earlier for any reason other than dishonesty or neglect of duty on the part of petitioner.[3]

Consistent with the terms of the employment agreement, petitioner and Spencer Foods executed a document dated November 21, 1975, and captioned "Spencer Foods, Inc.— Option Agreement—1969 Qualified Stock Option Plan" (herein the option agreement), which granted to petitioner an option to purchase 10,000 shares of common stock of Spencer Foods at an exercise price of $5 per share (herein the option). It referred to petitioner as a "key employee," and provided that the option was subject to the terms and conditions of the option agreement and of Spencer Foods' 1969 Qualified Stock Option Plan (herein the stock option plan).[4] The stock option

---

[3] Par. 5 of the employment agreement provided in relevant part as follows:

"5. It is further understood and agreed that in the event Employer shall merge with or become a subsidiary of or sell substantially all of its assets to any other person, firm or corporation * * *, the Employee shall have the right, upon ten days prior written notice to the Employer, to receive (on or prior to the date of closing of any such merger or sale transaction) an amount in cash equal to the difference between the stock option exercise price and the closing market price of Employer's common stock on such closing date. It is further agreed that in event Employee's employment with Employer is terminated for any reason (except for * * * [dishonesty or neglect of duty on the part of petitioner]) prior to the five-year term of this Employment Agreement, said stock option shall remain in force and effect for the remainder of such five-year period (but without representation by the Employer that it will continue to be deemed a "qualified" option under the provisions of the Internal Revenue Code * * *)."

Petitioner insisted on inclusion of the provisions of par. 5 in the employment agreement for his protection in the event Spencer Foods sought to terminate his employment or if another company sought to acquire Spencer Foods. Prior to his employment with Spencer Foods, petitioner had been employed by Iowa Beef Processors (IBP), which had granted him stock options. When IBP prematurely terminated his employment, petitioner was unable to exercise or otherwise benefit from the IBP options. Petitioner sought to avoid a similar situation with respect to the option granted to him by Spencer Foods.

[4] Par. 1 of the option agreement, in which petitioner and Spencer Foods were referred to respectively as "Optionee" and "Spencer," provided, in part, as follows:

"Spencer hereby grants to Optionee the right and option to purchase 10,000 shares of the Common Stock $1.00 par value per share, of Spencer at a price of $5.00 per share on the terms and conditions set forth in this grant, and in the 1969 Qualified Stock Option Plan. * * *

"The Optionee agrees to remain in the employ of Spencer * * * for a period of not less than two (2) years * * *. In the event the Optionee shall have an employment contract with Spencer * * * and such employment contract might be deemed to be inconsistent with the provisions of this paragraph, then the provisions of said employment contract shall control."

plan indicated that its purposes, among others, were to assist Spencer Foods in retaining the services of its executives and key employees and to offer such personnel additional incentives to put forth maximum efforts for the success of the business.

The option was not immediately exercisable in full by petitioner; the option agreement provided that for each 12-month period during which the option was outstanding, petitioner would be entitled to purchase 20 percent of the shares subject thereto. If less than the allowable 20 percent of the shares were purchased in any 12-month period, the portion not purchased could be subsequently acquired. Moreover, under the terms of both the option agreement and the stock option plan, the option was not transferable by petitioner other than by will or the law of descent and distribution and could be exercised during petitioner's lifetime only by him.

During the early part of 1978, petitioner spent several months in Florida reviewing the operations of a subsidiary of Spencer Foods. Spencer Foods ultimately decided that the subsidiary should be sold, and petitioner undertook to find a buyer. Petitioner negotiated on behalf of Spencer Foods with Trade Winds Inc., a corporation which was willing to purchase the subsidiary on the condition that petitioner manage the operations of the subsidiary on its behalf. Although Spencer Foods was amenable to such an arrangement, the transaction ultimately was not consummated.

During his stay in Florida, petitioner formed a corporation under the laws of that State, Hereford Trading Corp. (herein Hereford Trading), of which he was president and sole shareholder.[5]

In July or August, 1978, petitioner returned from Florida to Iowa. At that time, Land O'Lakes, Inc., a Minnesota corporation (herein Land O'Lakes), made a tender offer to purchase all of the issued and outstanding shares of common stock of Spencer Foods at $12 per share. In view of the impending

---

[5]The record is unclear concerning petitioner's purpose in forming Hereford Trading. The only evidence on this point was the following testimony given by petitioner on direct examination:

Q. What was the purpose for which you set up Hereford Trading Corporation?

A. Well, I would have had two incomes at that time, and I was setting up a separate corporation in Flordia. A & P at that time, were disposing of numerous supermarkets up and down the Florida coast. I had hoped to be able to buy one of those, financed by a company out of Geneva, Alabama, and put my sons in the supermarket business.

acquisition by Land O'Lakes, petitioner and Spencer Foods sought to amicably terminate their employment relationship and their respective obligations under the employment agreement. Accordingly, they entered into an agreement and release dated September 1, 1978, under which petitioner resigned as an officer and employee, and expressly released Spencer Foods from any further liabilities under the employment agreement. Pursuant to the agreement and release, petitioner agreed to make himself available for a 1-year period to perform consulting services and to assist in the transition to new management following the acquisition by Land O'Lakes. For its part, Spencer Foods agreed to pay petitioner a consulting fee of $50,000. Such payment was made on September 8, 1978, by means of a check payable to the order of petitioner. Neither the agreement and release, pursuant to which petitioner agreed to provide consulting services, nor the check by which Spencer Foods paid the consulting fee, made any reference to Hereford Trading.

At the time of Land O'Lakes tender offer, petitioner had not yet exercised any part of the option. Accordingly, consistent with the terms of the employment agreement,[6] the agreement and release further provided that, upon the consummation of the Land O'Lakes tender offer, the option would terminate and, in exchange therefor, Spencer Foods would pay petitioner $7 for each of the 10,000 shares of stock subject to the option. This amount represented the difference between the $5-per-share exercise price of the Option and the $12-per-share price offered by Land O'Lakes.[7] Thereafter, the acquisition of Spencer Foods by Land O'Lakes was consummated. Accordingly, the option was terminated, and Spencer Foods paid to petitioner the sum of $70,000 in consideration therefor.

On their joint Federal income tax return for 1978, petitioners reported the $70,000 received in exchange for the termination of the option as a long-term capital gain. They did not report as income the $50,000 consulting fee paid to petitioner by Spencer Foods. However, the consulting fee was reported on the Federal income tax returns of Hereford Trading for its

---

[6] See note 3 and accompanying text *supra.*

[7] On Sept. 22, 1978, petitioner and Spencer Foods also executed an "Agreement to Terminate Stock Option," in which they reiterated their agreement concerning the termination of the option.

taxable years ended January 31, 1979, and January 31, 1980.[8]

In his notice of deficiency, respondent determined that the $70,000 received by petitioner in exchange for the termination of the option was taxable as ordinary income, and that the $50,000 consulting fee was taxable to petitioner rather than to Hereford Trading.

## OPINION

### Issue 1. Termination of Stock Option

The first issue is whether the $70,000 received by petitioner in exchange for the termination of the option is taxable as ordinary income, or instead, as capital gain.

Respondent asserts that resolution of this issue is governed by section 83,[9] which relates generally to the transfer of property in connection with the performance of services. He argues that, under the rules of that section, petitioner must treat the $70,000 received in exchange for the termination of the option as compensation. Petitioner's primary argument, as we understand it, is that the option was not transferred in connection with the performance of services, and thus is not governed by section 83. He asserts, therefore, that the option was not compensatory and that the amount received upon termination thereof was taxable as capital gain. For the following reasons, we agree with respondent.[10]

---

[8]Of the $50,000 fee, $20,833 was reported by Hereford Trading on its Federal income tax return for the taxable year ending Jan. 31, 1979, and $29,167 was reported on its Federal income tax return for the taxable year ending Jan. 31, 1980. Hereford Trading is not a party to this proceeding, and we are not called upon in this case to decide the propriety of its reporting of the $50,000 fee over 2 taxable years.

[9]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[10]Sec. 83 and the regulations thereunder govern the tax treatment of certain options, formerly governed by sec. 1.421–6, Income Tax Regs., which were granted after June 30, 1969. See sec. 1.421–6(a)(2), Income Tax Regs.; see also Robinson v. Commissioner, 82 T.C. 444, 452–453 (1984); Pledger v. Commissioner, 71 T.C. 618, 629 (1979), affd. 641 F.2d 287 (5th Cir. 1981), cert. denied 454 U.S. 964 (1981). Prior to the enactment of sec. 83, this Court previously addressed the issue herein presented in Kunsman v. Commissioner, 49 T.C. 62 (1967). There, the taxpayer received a payment from his employer in exchange for the termination of stock options issued under the employer's restricted stock option plan. Relying upon sec. 1.421–6, Income Tax Regs., this Court determined that the amount so received was treated as compensation and thus was taxable as ordinary income, rather than capital gain. We further held that sec. 1234, relating to the tax treatment of certain options to buy or sell property, did not require a contrary holding. Other courts faced with the issue have reached a similar conclusion, also based upon sec. 1.421–6, Income Tax Regs. See Rank v. United States, 345 F.2d 337 (5th Cir. 1965); Dugan v. United States, 234 F. Supp. 7

## A. Applicability of Section 83

Section 83 provides in general that, where property is transferred in connection with the performance of past, present, or future services, the excess of the fair market value of the property over the amount, if any, paid for the property, is includable as compensation in the gross income of the taxpayer who performed the services.[11] See secs. 83(a), 83(i); secs. 1.83–1(a)(1), 1.83–3(e), Income Tax Regs. See also *Alves v. Commissioner*, 734 F.2d 478 (9th Cir. 1984), affg. 79 T.C. 864 (1982); *Sakol v. Commissioner*, 574 F.2d 694 (2d Cir. 1978), affg. 67 T.C. 986 (1977); *Cohn v. Commissioner*, 73 T.C. 443 (1979). However, section 83 is inapplicable to a transaction to which section 421, relating to certain qualified and other options, applies. See sec. 83(e)(1); sec. 1.83–7, Income Tax Regs. Thus, in order for section 83 to be applicable with respect to a stock option, two conditions must be satisfied. First, the option must be transferred in connection with the performance of services. Second, the transaction involving the option must be one to which section 421 does not apply. See sec. 83(a), sec. 83(e)(1); sec. 1.83–7, Income Tax Regs. We conclude that both requirements are satisfied in this case.

Whether property is transferred in connection with the performance of services is essentially a question of fact. See sec. 1.83–3(f), Income Tax Regs. Cf. *Alves v. Commissioner*, 734 F.2d 478, 481 (9th Cir. 1984). Although petitioner argues otherwise, a review of the facts herein clearly establishes that the option was granted by Spencer Foods in connection with petitioner's performance of services.

The grant of the option was provided for in the employment agreement, pursuant to which petitioner agreed to render services as an employee of Spencer Foods. For its part, Spencer Foods agreed to pay petitioner a salary and bonus, and to grant him an option to purchase shares. The option was granted under the option agreement, which referred to peti-

---

(S.D.N.Y. 1964).

Sec. 1.421–6, Income Tax Regs., relied upon in the above-cited cases, generally does not apply to options granted after June 30, 1969. See sec. 1.421–6(a)(2), Income Tax Regs. Its provisions are thus inapplicable herein, since the option was granted to petitioner in November 1975.

[11]Sec. 83 is generally applicable with respect to property transferred after June 30, 1969. Sec. 83(i) sets forth transitional rules which provide several exceptions concerning the June 30, 1969, date, none of which is relevant herein.

tioner as a "key employee," and was governed by the provisions of the stock option plan. The purposes of granting options under the stock option plan, were, among others, to assist Spencer Foods in retaining the services of its executives and key employees and to offer such personnel additional incentives to put forth maximum efforts for the success of the business. Moreover, the sole consideration furnished by petitioner to Spencer Foods in exchange for the option was his promise to render services as an employee. In view of the employment relationship between Spencer Foods and petitioner, as well as the tenor of the documents relating to the option, it is apparent that Spencer Foods' intent in granting the option was to compensate and better secure petitioner's services as its employee. Cf. *Commissioner v. LoBue*, 351 U.S. 243, 247 (1956). Accordingly, we conclude for purposes of section 83 that the option was transferred to petitioner in connection with the performance of services.[12]

In order for section 83 to be applicable herein, the transaction involving the option must be one to which section 421 does not apply. See sec. 83(e)(1); sec. 1.83-7, Income Tax Regs. Section 421(a), in conjunction with section 422(a), provides generally that no income shall result at the time of the transfer of a share of stock upon the exercise of a qualified stock option if no disposition of such share is made within a prescribed 3-year period.[13] Although the option purported to

---

[12]Our conclusion is not altered by the fact that under par. 5 of the option agreement, petitioner could have exercised the option during the prescribed 5-year period even if his employment with Spencer Foods were terminated earlier. This provision was inserted at petitioner's insistence primarily to discourage Spencer Foods from terminating his employment prior to the expiration of the 5-year period set forth in the employment agreement. See note 2 *supra*. Thus, we draw no inference therefrom that the option was not transferred to petitioner in connection with the performance of services.

[13]As relevant herein, sec. 421(a) provides as follows:

SEC. 421(a). EFFECT OF QUALIFYING TRANSFER.—If a share of stock is transferred to an individual in a transfer in respect of which the requirements of section 422(a), * * * are met—

(1) * * *, no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;

In turn, sec. 422(a) provides as follows:

SEC. 422(a). IN GENERAL.—Subject to the provisions of subsection (c)(1), section 421(a) shall apply with respect to the transfer of a share of stock to an individual pursuant to his exercise of a qualified stock option if—

(1) no disposition of such share is made by such individual within the 3-year period beginning on the day after the day of the transfer of such share, and

(2) at all times during the period beginning with the date of the granting of the option and ending on the day 3 months before the date of such exercise, such individual was an employee of

be a qualified stock option.[14] section 421 is inapplicable herein. In order for that section to be applicable, "the option must be exercised, the stock held for the requisite period and then sold according to the provisions of the statute. Where the option itself is transferred or cancelled prior to exercise, section 421 is not applicable. *Mitchell v. Commissioner*, 65 T.C. 1099, 1110 (1976), affd. 590 F.2d 312 (9th Cir. 1979). Thus, since the option was terminated prior to exercise, section 421 is inapplicable.

Accordingly, since the option was transferred to petitioner in connection with the performance of services, and since section 421 is not applicable, we conclude that the tax consequences of the option are governed by section 83.[15]

## B. Effect of Section 83

A person who receives an option to which section 83 is applicable will be taxed either (a) at grant or (b) at exercise or disposition thereof, depending upon whether the option has a readily ascertainable fair market value when granted. See secs. 83(e)(3), 83(e)(4). Sec. 1.83–7, Income Tax Regs. If the option has a readily ascertainable fair market value when granted, section 83 causes the realization of compensation income at the time of the grant of the option. See secs. 83(a), 83(e)(3); sec. 1.83-7(a), Income Tax Regs. If such an option does not have a readily ascertainable fair market value when granted, section 83 causes the realization of compensation income at the time the option is exercised or disposed of. See secs. 83(a), 83(e)(4); sec. 1.83-7(a), Income Tax Regs. Cf. *Robinson v. Commissioner*, 82 T.C. 444 (1984). For the following reasons, we hold that the option did not have a readily ascertainable fair market value when granted, and according-

---

either the corporation granting such option, a parent or subsidiary corporation of such corporation, or a corporation or a parent or subsidiary corporation of such corporation issuing or assuming a stock option in a transaction to which section 425(a) applied.

[14]See sec. 422(b). We have, without deciding, assumed that the option was a qualified stock option. We note that the employment agreement contained several provisions relating to the option. See note 3 and accompanying text *supra*. We need not consider whether such provisions would cause the option to not satisfy the requirements set forth in sec. 422(b) pertaining to qualified stock options, since sec. 83 would also be applicable in the same manner as herein described, and would mandate the identical result reached herein if the option were not a qualified stock option. See sec. 83(a); sec. 1.83–7, Income Tax Regs. Cf. *Robinson v. Commissioner, supra; Pledger v. Commissioner, supra.*

[15]Cf. *Horwith v. Commissioner*, 71 T.C. 932 (1979), in which the rules of sec. 83 were applicable when stock was received upon the surrender of unexercised qualified stock options.

ly, that the rules of section 83 are applicable upon the termination of the option.

For purposes of section 83, an option generally does not have a readily ascertainable fair market value when granted unless it is actively traded on an established market. Sec. 1.83–7(b)(1), Income Tax Regs. Petitioner concedes that the option was not actively traded on an established market. Under section 1.83–7(b)(2), Income Tax Regs., an option not actively traded on an established market is considered not to have a readily ascertainable fair market value when granted unless the taxpayer can show that, at such time, all of the following conditions exist:

(i) The option is transferable by the optionee;

(ii) The option is exercisable immediately in full by the optionee;

(iii) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option; and

(iv) The fair market value of the option privilege is readily ascertainable in accordance with paragraph (b)(3) of [sec. 1.83–7, Income Tax Regs.].

Cf. *Welsh v. United States*, 2 Cl. Ct. 417 (1983); *Mitchell v. Commissioner, supra; Shamburger v. Commissioner*, 61 T.C. 85 (1973), affd. per curiam 508 F.2d 883 (8th Cir. 1975).

It is clear that the option fails to satisfy several of these conditions. When granted, the option did not satisfy the first prescribed condition of section 1.83–7(b)(2), Income Tax Regs., since, under the terms of the option agreement and the stock option plan, it was not transferable by petitioner other than by will or the laws of descent and distribution. Moreover, the option did not satisfy the second condition set forth in section 1.83–7(b)(2)(ii), Income Tax Regs., since, under the terms of the option agreement, it was not immediately exercisable in full by petitioner; it could only be exercised as to 20 percent of the shares subject thereto for each 12-month period following the grant of the option.[16] Since petitioner is required to show that

---

[16]Focusing on the last sentence of par. 1 of the option agreement, petitioners argue that the option was, in effect, governed only by the employment agreement and not subject to the restrictions contained in the option agreement and in the stock option plan. See note 4 *supra.* We reject petitioners' argument. We construe par. 1 of the option agreement to mean that the option was generally subject to the terms and conditions set forth in the option agreement and the stock option plan. We interpret the last sentence thereof to mean only that, insofar as the provisions of the employment agreement concerning the 5-year term of petitioner's employment differed from

the option satisfied all of the conditions set forth in sec. 1.83–7(b)(2), Income Tax Regs., and we have held that it failed to satisfy two of such conditions, we need not consider whether the option satisfied the remaining conditions set forth therein. Cf. *Mitchell v. Commissioner, supra*; *Shamburger v. Commissioner*, 61 T.C. 85 (1973). Thus, since the option was not actively traded on an established market, and not all of the conditions of section 1.83–7(b)(2), Income Tax Regs., were satisfied, the option's fair market value at grant was not readily ascertainable within the meaning of section 1.83–7(b), Income Tax Regs.

Section 1.83–7(a), Income Tax Regs., provides that if an option not having a readily ascertainable fair market value when granted is sold or otherwise disposed of in an arm's-length transaction, the person who performed the services realizes compensation income at such time under the rules of section 83. Since the amount received by petitioner was based upon the difference between the previously fixed exercise price of the option and the tender offer price offered by Land O'Lakes to all shareholders of Spencer Foods, we conclude that the termination of the option constituted a disposition in an arm's-length transaction for purposes of section 1.83–7, Income Tax Regs.,[17] and that petitioner realized compensation income at the time of such termination. Sec. 1.83–7(a), Income Tax Regs.

Under the general rule of section 83(a), compensation income is measured by the excess of the fair market value of the "property" transferred over the amount, if any, paid for the property. In general, "property" for purposes of section 83 does not include money. Sec. 1.83–3(e), Income Tax Regs. However, where an option is sold or otherwise disposed of in an arm's-length transaction, section 83(a) applies to the transfer of money in the same manner as it would have

---

the corresponding provisions of the option agreement, which referred to a 2-year employment period, the former would control.

[17]Cf. Rev. Rul. 73–146, 1973–1 C.B. 61; Rev. Rul. 67–366, 1967–2 C.B. 165.

Under sec. 83 and the regulations thereunder, the amount of compensation income upon disposition of an option is measured by the excess of the amount received over the amount paid, if any, for the option. See sec. 1.83–7, Income Tax Regs. The "arm's-length" requirement is intended to assure that the statutory scheme is not circumvented by means of a disposition for less than fair consideration. Cf. secs. 1.83–1(b), 1.83–1(c), and 1.421–6(a), Income Tax Regs.; *Enos v. Commissioner*, 31 T.C. 100 (1958). See generally Billman, "Nonstatutory Stock Options," 383 Tax Mgmt. A–17—A–19 (1984).

applied to the transfer of property pursuant to the exercise of the option. Sec. 1.83–7(a), Income Tax Regs. Thus, on the facts of this case, section 83(a) is to be applied as though petitioner received "property" having a fair market value of $70,000 upon the termination of the option. Since petitioner paid nothing upon either the grant or the termination of the option, his amount paid is zero. Sec. 1.83–3(g), Income Tax Regs. He must, therefore, include the full $70,000 in gross income as compensation pursuant to section 83 and the regulations thereunder.

In view of the foregoing, we hold that the $70,000 received by petitioner in exchange for the termination of the option is taxable as ordinary income, and not as capital gain.[18]

## Issue 2. Consulting Fee

The second issue is whether the $50,000 consulting fee paid to petitioner by Spencer Foods is taxable to petitioner, or rather to Hereford Trading. Petitioner contends that the fee is taxable to Hereford Trading, while respondent, relying upon the assignment of income doctrine, argues that the fee is taxable to petitioner.

The assignment of income doctrine, under which income is to be taxed to the person who earned it, is a fundamental

---

[18]We consider our holding on this issue entirely consistent with the statutory provisions relating to qualified stock options. Those provisions allow capital gain treatment if a qualified stock option is exercised, and the stock obtained thereby held for the period prescribed by the statute. See secs. 421(a), 422(a); *Mitchell v. Commissioner*, 65 T.C. 1099, 1108–1110 (1976), affd. 590 F.2d 312 (9th Cir. 1979). Petitioner thus might have obtained capital gain treatment if he had exercised the option and held the stock so acquired for the 3-year period prescribed in sec. 422(a). Any earlier disposition of the stock, however, would have given rise to ordinary income. See sec. 421(b). Given this statutory scheme, it would be incongruous indeed "to attribute capital gain treatment to the proceeds received for the extinguishment of an option where the fruits of such option * * *, if received and translated into the same cash at that very moment, would have been treated as ordinary income." *Rank v. Commissioner*, 345 F.2d 337, 345 (5th Cir. 1965).

Lastly, we note that sec. 1234, relating to the tax treatment of certain options to buy or sell property, does not require a contrary holding. Under the general rule of sec. 1234(a)(1), the character of gain or loss upon the sale or exchange of an option is determined by reference to the character of the property subject to the option. However, this rule is inapplicable if income derived in connection with the sale or exchange of an option would, without regard to sec. 1234, be treated as other than gain from the sale or exchange of a capital asset. Sec. 1234(a)(3). Sec. 1234 does not apply to gain resulting from the sale or exchange of an option to the extent that the gain is in the nature of compensation. Sec. 1.1234–1a), Income Tax Regs. Since the amount received by petitioner in exchange for the termination of the option is treated as compensation under sec. 83, the general rule of sec. 1234 is thus inapplicable with respect thereto. See *Kunsman v. Commissioner*, 49 T.C. 62, 68–71 (1967); *Mitchell v. Commissioner, supra; Rank v. United States*, 345 F.2d 337 (5th Cir. 1965); *Dugan v. United States*, 234 F. Supp. 7 (S.D.N.Y. 1964).

principle of the income tax law. *United States v. Basye*, 410 U.S. 441, 450–451 (1973). See *Lucas v. Earl*, 281 U.S. 111 (1930). However, as we noted in *Johnson v. Commissioner*, 78 T.C. 882, 890 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984), in cases involving closely held or one-man personal service corporations, a tension has evolved between the basic tenets of this doctrine and the recognition of the nature of the corporate business form. A corporation, in addition to being a separate legal entity, is a separate taxpayer for Federal tax purposes. *Moline Properties v. Commissioner*, 319 U.S. 436, 438–439 (1943). Further, it is axiomatic that a corporation can act only through its agents. *Keller v. Commissioner*, 77 T.C. 1014, 1032 (1981), affd. 723 F.2d 58 (10th Cir. 1983).

In resolving the issue of whether an individual or his wholly owned corporation is taxable with respect to income earned through the performance of personal services, we have held that the relevant inquiry must focus on whether the individual or the corporation controls the earning of the income. See *Johnson v. Commissioner, supra.* Under this approach, we held in *Johnson v. Commissioner, supra*, that two necessary elements must be present before the corporation, rather than its service-performer employee, will be considered the controller of the earning of the income. First, the service-performer employee must be just that—an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense. Second, there must exist between the corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position. See *Johnson v. Commissioner, supra* at 891, and cases cited therein.

Petitioners bear the burden of proving that respondent's determination was erroneous. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). Therefore, to establish that the $50,000 consulting fee received by petitioner is taxable to Hereford Trading, petitioners must show that the corporation controlled the earning of the consulting fee within the standard set forth in *Johnson v. Commissioner, supra.* Based upon this record, we conclude that they have failed to do so.

First, the record contains no evidence that petitioner was truly an employee of Hereford Trading and subject to its

direction and control. There is, for instance, no evidence that petitioner had an employment contract or other agreement with Hereford Trading tending to establish that he was an employee of that corporation. Compare *Johnson v. Commissioner, supra* at 891–892; *Pacella v. Commissioner,* 78 T.C. 604 (1982); *Keller v. Commissioner,* 77 T.C. 1014, 1032 (1981), affd. 723 F.2d 58 (10th Cir. 1983). Similarly, there is no evidence concerning the activities and operations of Hereford Trading from which it might be inferred that such entity controlled petitioner's performance of consulting services.

Moreover, petitioners have failed entirely to show that Spencer Foods contracted with or otherwise recognized Hereford Trading in connection with petitioner's performance of consulting services. The agreement and release, pursuant to which petitioner agreed to perform consulting services, was executed only by Spencer Foods and by petitioner in his individual capacity; it made no reference to Hereford Trading. Similarly, the $50,000 check by which Spencer Foods paid for consulting services was issued to and payable to the order of petitioner, not Hereford Trading. In short, there is no evidence that Spencer Foods was even aware of the existence of Hereford Trading, or that it looked to and recognized that entity as controlling petitioner's performance of consulting services.

We conclude that petitioners have failed to carry their burden of proof with respect to this issue. Accordingly, following the principles set forth in *Johnson v. Commissioner, supra,* we hold that petitioner, and not Hereford Trading, was taxable with respect to the $50,000 consulting fee received from Spencer Foods.

To reflect the foregoing,

*Decision will be entered for the respondent.*